Filed 9/29/21  P. v. Ellis CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078708 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FBA009502) |
| MOY ELLIS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Bernardino County, Steven A. Mapes, Judge.  Affirmed.

Lizabeth Weis, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

In 2010, a jury convicted Moy Ellis and her codefendant of murder (Pen. Code,[1] § 187, subd. (a)) and found true the special circumstance that the murder was intentional and involved torture (§ 190.2, subd. (a)(18)); assault on a child causing death (§ 273ab); torture with great bodily injury

_____

[1]    All further statutory references are to the Penal Code.

(§§ 206 and 12022.7); and child abuse with a finding Ellis and the codefendant willfully caused and permitted a child to suffer, and inflicted injury that resulted in death (§§ 273a, subd. (a) and 12022.95).  Ellis was sentenced to life without parole.

Ellis appealed and this court affirmed the convictions and sentence in an unpublished opinion.  (*People v. Darthart et al.* (Feb. 28, 2012, D057950) [nonpub. opn.].)[2]

In 2019, Ellis filed a pro. per. petition for resentencing under section 1170.95.  The court appointed counsel, received briefing, considered the record of conviction, issued an order to show cause, and held an evidentiary hearing.  At the conclusion of the hearing, the court denied the petition.  The court found Ellis was an actual killer and a major participant in the criminal acts leading to the death of a child.

Ellis filed a timely notice of appeal.

Appellate counsel has filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) indicating counsel has not been able to identify any arguable issues for reversal on appeal.  Counsel asks the court to review the record for error as mandated by *Wende*.  We offered Ellis the opportunity to file her own brief on appeal, but she has not responded.

STATEMENT OF FACTS

Appellant's opening brief contains an accurate statement of facts derived from our prior opinion.  We will incorporate it here for convenience.

"At about 3:00 p.m. on September 5, 2006, Darthart called 911 to report his son, Thomas, who had turned three years old that day, was unconscious but breathing.  Darthart reported that the night before, Thomas had fallen in the bathtub the night before, and was found unconscious, but Darthart had

---

[2]    We take judicial notice of our records in case No. D057950.

revived him with cardiopulmonary resuscitation.  When paramedics arrived, they noted that Thomas had no pulse or heart rhythm and showed signs of lividity, therefore they pronounced him dead.  One paramedic said neither Ellis or Darthart showed any emotion and described their demeanor as 'fairly nonchalant.'

"Officers noted there was a paddle with Thomas'[s] name and a sad face drawn on one side and the name of Ellis'[s] daughter and a sad face on the other side.  Apart from one teddy bear, there was no evidence of any birthday celebrations for Thomas.  While officers processed the apartment, Ellis was heard saying, 'I didn't do anything,' but neither Darthart nor Ellis mentioned Thomas or remorse for his death.

"A month earlier, Ellis talked to her neighbor, Jenette Gay, and told her that Thomas said he hated Ellis, and that she thought 'he had "the devil in him." '  Three days before Thomas's death, Ellis went to Gay's house and cried for ten minutes without answering Gay's questions about why she was crying.  On September 4, the day before Thomas's death, Gay agreed to take Ellis and Darthart to the store, where they bought soap, toilet tissue, bleach, and personal hygiene products.  They never mentioned that it was Thomas's birthday, and when Gay asked about the children and they said that Ellis's daughter was looking after Thomas at home, Gay said she would prefer that they were not left alone.

"Darthart and Ellis agreed to go to the police station to be interviewed.  At the police station, Darthart was interrogated twice, once before *Miranda*[3] advisals and once after.  During the first interview, Darthart initially voluntarily that the bruises on Thomas's back and the injuries to the back of his legs was from that Saturday when he fell down the bleachers at the park.

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436.

He also explained that Thomas hit his eye on a wooden chair at around 11:30 p.m. on September 4. Darthart made him take a bath, but he was not supervised. Thomas fell in the tub and was unconscious. Darthart revived him with CPR, but he did not call the paramedics; instead, the family went to sleep. When Darthart woke up around 2:30 p.m. on September 5, Thomas had a pulse briefly, but his stomach was swollen and green.

"While Darthart was taking a break from his interview to smoke a cigarette, Ellis was also interviewed without *Miranda* advisals. She told the officer Thomas injured his legs falling at the park on August 26. They did not seek medical attention because they used home remedies, and Thomas was fine. They put him unsupervised in the bathtub because he was independent and could bathe himself. When Darthart told her Thomas must have fallen in the tub, Ellis saw a bump on his forehead. After they had revived Thomas with CPR, Ellis saw his facial injuries and thought the CPR had caused them. They called paramedics when they saw Thomas's stomach was swollen.

"Ellis admitted to police that she disciplined Thomas with a paddle and spanked him with it five times on the evening of September 3, because he had soiled himself even though he was toilet trained. Ellis described their rule that they would spank Thomas five times whenever he got in trouble. She was aware that Darthart had also spanked Thomas with the paddle that night. She acknowledged using a belt that police found in the apartment to spank Thomas and was aware that Darthart had used the same belt to spank Thomas as recently as September 3. She said she generally disciplined Thomas by 'whipping him and requiring him to stand in the corner with his hands in the air.' If he looked back, which was not allowed, she and Darthart would 'pop him with the belt.' She admitted that she and Darthart caused

the injuries to Thomas's buttocks and legs with their discipline, but maintained that the back of his knee and bottom of his calf were injured when he fell from the bleachers and that his head injuries were caused by his fall in the tub and their CPR efforts.

"That evening, after the officer realized he had failed to record part of Darthart's interview and all of Ellis's interview, he advised Darthart of his *Miranda* rights, and Darthart agreed to speak to him a second time. In this interview, Darthart said that he and Ellis woke up around 7:00 a.m. on September 5; they checked on Thomas, whose heart was beating. Darthart took Ellis's daughter to school, came home and went back to sleep until 2:30 p.m., and when he saw Thomas's condition, he called 911. Darthart said he had last disciplined Thomas two weeks earlier, but he used his hand because Thomas's 'booty was like cut up. So I know, and you can see the markings . . . had been there for a minute.' He said that most recently, Ellis whipped Thomas with a paddle five times because he has soiled himself. Then, Darthart sent Thomas to stand in the corner. Darthart said Thomas would 'ram his head into the wall' because '[he] was mad or whatever,' which is how Thomas got the head bruises.

"Darthart also explained Thomas's other injuries. Darthart said he only used his hands on Thomas and denied using a paddle, but he said Ellis had whipped his bottom with a paddle because he peed on himself. Darthart did not have an objection to Ellis using a paddle, though, because 'that was her discipline' and she was Thomas's care provider.

"Dr. Trenkle, the forensic pathologist who performed the autopsy on Thomas, classified the manner of death as homicide. He testified that he believed Thomas had been beaten, burned, hit in the head multiple times, and he had an injury to the back of his head that was caused by his head

5

hitting a solid object.  While Thomas was still alive, he went under water and drowned.  Dr. Trenkle concluded hemorrhaging contributed to the death.  He did not find much blood inside Thomas's organs, and although he had holes and lesions on his extremities which should have bled a lot, but there was no blood found at the scene.  Dr. Trenkle opined that if Thomas were alive and had the holes in the back of his legs, there should have been blood everywhere, but not if Thomas had bled out somewhere else and died, and then he was put in the bed.

"Dr. Trenkle opined that Thomas may have been injured in the week before his death, such the burns on the back of his legs, but other injuries were inflicted the day before he died.  The injuries were likely quite painful; the lesions on the back of both legs and buttocks were comparable to second degree burns.  Dr. Trenkle also found that Thomas had a subdural hematoma, bruises on his forehead from impact, and a contusion of the brain from a blow to the head or his head impacting an object.

"Dr. Trenkle disputed Darthart's explanation of Thomas's injuries, finding that there were many more injuries than accounted for by Darthart.  He did not believe the lesions on the back of Thomas's buttocks or thighs could be caused by a scraping or abrading injury, as Darthart described.

"At trial, Ellis testified that she and Darthart were engaged and she had cared for Thomas while Darthart was at work, from June to mid-August, when she stopped being his caretaker after an altercation with Darthart.  He grabbed her hair and pushed her against the wall because he disliked how she talked to Thomas, and he threatened to kill her if she turned Thomas against him.  She explained that this was what caused her to cry in front of Gay.  Ellis did not tell the police investigator about the altercation.  Ellis reconciled with Darthart after this incident.

"Ellis testified that she spanked Thomas on his buttocks, but denied using a paddle or a belt, or having told the investigating officer that she had. On August 26, while Ellis was at her mother's house, her family told her Thomas had injuries to his buttocks. She acknowledged the injuries were bad, but she thought they were treatable. Darthart said the bruise on Thomas's rib and upper arm were from him snatching up Thomas. On August 28, Ellis saw Thomas's injuries from falling at the park but they also seemed treatable. The night of September 4, she and Darthart disciplined Thomas by striking his chest three times with the palm of his hand, which likely caused his chest injuries. She did not tell the officer about that because she was covering up for Darthart.

"Ellis admitted making the paddle, but she claimed it was to scare the children and not to discipline them. She did not check on Thomas when he was in bed with her on September 5 because Darthart had checked him.

"Ellis's sisters, Angel and Antranett testified that they had previously lived with Ellis and never saw her hit Thomas. On August 26, Antranett was preparing to bathe Thomas and saw what appeared to be burn marks on his buttocks and a bruised wrist and rib. Thomas told her that 'daddy did it.' Antranett told her brother, Reon, and her mother, Linda, but she never called the police.

"Reon testified Thomas said his dad caused his injuries; he got so angry he had to leave his mother's house. He never called the police.

"Linda saw Thomas's injuries on August 26, and he said his daddy did it. Linda called Ellis, told her about the injuries, and urged her to leave Darthart and come back home. Linda never called the police."

DISCUSSION

As we have noted, appellate counsel has filed a *Wende* brief and asks the court to review the record for error.  To assist the court in its review, and in compliance with *Anders v. California* (1967) 386 U.S. 738 (*Anders*), counsel has identified the following possible issue that was considered in evaluating the potential merits of this appeal:  "Does the jury's instruction on the torture murder special circumstance with CALCRIM No. 733, including the element that 'the defendant intended to kill' (Aug CT 57) and the jury's finding on the torture special circumstance that 'the murder was intentional' (Aug CT 91) render Ellis ineligible for relief as a matter of law?"

We have reviewed the entire record as required by *Wende* and *Anders*. We have not discovered any arguable issues for reversal on appeal. Competent counsel has represented Ellis on this appeal.

DISPOSITION

The order denying Ellis's petition for resentencing under section 1170.95 is affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.

8